206 Maglana v. Celebrity Cruises 206 Maglana v. Celebrity Cruises Mr. Parrish Good morning. May it please the Court. Philip Parrish on behalf of the appellants, Mr. Maglana and Booyong. We're here today on de novo review of an order of the District Court which compelled two intentional tort claims to arbitration. We believe that this case is controlled by a prior decision of this Court, Doe v. Princess Cruise Lines. And that the District Court erred in distinguishing Doe. The District Court addressed Doe only in a footnote and distinguished it, we believe, by misperceiving its holding. The District Court said that the difference there was that the rape occurred after hours and while off duty. But the issue here is not whether, in Doe, the woman who was raped, the crew member, was after hours. We had actually raised, I was counsel for Doe in that case, we had actually raised the argument that it was after hours because, you know, to try to distinguish it as not being within the purview of the contract. The cruise line, on the other hand, argued, well, if you're a crew member, you're a crew member 24-7 and so anything, even an intentional tort after the rape and the way that you treated the crew member is covered by the arbitration agreement and arises out of the employment. And this Court in Doe said, well, actually, you're both kind of wrong on that. The five claims that were based upon crew member seaman status, the Jones Act claims, the unseaworthiness claims, and the maintenance and cure claims, those are definitely tethered to your employment contract and those were to send back for arbitration. However, these intentional tort claims, which arose, by the way, while the contract was still in place, we think that this case is even stronger for reversal than those portions of Doe were for affirmance because here it's an undisputed fact that the cruise line terminated the entire cruise contract. Can I ask you just a threshold question? Yes. Just for my clarification, I don't see that you've done this and I just want to confirm, you're not making any argument about the jurisdictional prerequisites of or the affirmative defenses to the New York Convention, correct? Correct. And we're here simply because we believe that under Doe, these two claims, which arise out of conduct, it's actually in this case post-termination conduct by the cruise line and keeping all their crew members, including our two clients who are here as class representatives of all of the Filipino crew members who were kept against their will for weeks and months on end after their contracts were terminated and were essentially falsely imprisoned, were not treated fairly. Okay, can I ask you about those facts? So they terminated the contracts of the two individuals here named plaintiffs for cause. Is that right? That's what they say, yes. But we're not on the facts, Your Honor. You're not arguing about that at this stage? Correct. For theft and intoxication or whatever it was. Okay, one took the bottle, one drank. I don't know. And they no longer paid them any wages after March 30th. Is that right? That is correct. I looked at the contract. They're terminated by cause. And so when you're for cause, you don't get your seven days' notice, you don't get wages, and you don't get repatriation either, it looks like. You terminate from cause, that's it. But that's a fact. We're not, we didn't get past the date stage. You're great. And so you're on that ship. And so I looked at, kind of looking at it like a rape. And it looked like you're saying they wouldn't let you off the ship. They wouldn't let you leave. I mean, if I take the facial allegations. Correct. Is that what you're trying to say? They would not let you leave? They barred the door and said you can't walk off, you can't leave the ship? You have to stay on the ship? Absolutely. Or is it that your clients obviously have lost their job, they've lost their wages, they're on the other side of the world, and they have no shelter of food other than staying on the ship. But you're saying that's not what it was, your client's voluntary staying there, at least in your complaint. They would not, they held them captive, I'm using the terms. They held them captive, wouldn't let them leave that ship, basically. That's your false imprisonment. Right. Until two days after this action was filed. Right. And then they got them off in a hurry. Okay. And that's your intentional affliction, emotional distress too. Correct, Your Honor. And we do not concede. And so that's like the rape. This is not about anything. They're discharged, they're fired, no wages, forget about repatriation in count one. We're not arguing about who's got to pay to send them back, when you've got to go. Right. We've got this claim, we may be able to prove it or not. Correct. They may say, don't be silly, the doors were open, you could have walked off any time you want. I don't know what the evidence will be. Correct. None of us do. Okay. Or it could have been mental pressure, you don't have any food, you know. I don't know how you're going to prove the false imprisonment. Right. But that's what you say. That claim survives under Doe, the rape case. Correct. And the intentional infliction of emotional distress. And perhaps even for stronger reasons than the rape case, even because they're terminated. Correct. And with respect to the rest of the crew as well, for whom they did not. Well, I don't know about the rest of the crews. I mean, the class hasn't been certified, has it? It has not yet been certified. Okay. And see, your two plaintiffs have been terminated. So I don't know whether they're going to be good class representatives for the rest of the people. I don't know about all that. Correct. I don't know anything but what I know about your allegations and count when I read them. And I got them right here. Right. So he can be prepared to answer it. Because you say, they held us captive. We couldn't escape. And that is the basis. It's classic false imprisonment. Exactly. And so we believe this is controlled by Doe, that the fact that the Doe rape occurred after hours, which was the basis on which the district court just in a footnote. I'm not sure it occurs after hours, before hours. When it occurs, it was rape. It wasn't within the duties of the contract. Right. And we had initially some of the same claims as Ms. Doe did, and they were dropped from the first complaint to the second amendment complaint when Mr. Bouillon came on as another plaintiff. So the arbitrable claims under Doe were dismissed here. Upon the repatriation claim, the employment discrimination, national origin, count three, count five, suit four, lost wages under 103, 103. All that's gone. Correct. We're just up here on false imprisonment and intentional affliction. I notice in the intentional affliction of emotional distress complaint, you didn't specify what law you were traveling under. In the count two intentional tort, you said, under the laws of this country, I guess that could be state law, international law, and the maritime labor, but you didn't say any law in five. So typically it's Florida law that's used even in the maritime cases. There are plenty of those. And there was obviously no 12b6 action here either. If the complaint needs to be cleaned up upon remand, if I can be hopeful, then that can be done. But you're telling us you're traveling under Florida law in counts two and five. Common law, which applies here, as the court noted. Thank you for answering my question. Let me ask you something. Let's assume that we agree with you that the remaining counts are outside the scope of the arbitration provision. We have a provision also that says the arbitrator, not any federal, state, or local court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this agreement, including but not limited to any claim that all or part of the agreement is void or voidable as a choice of law. This strikes me as a classic delegation of arbitrability to the arbitrator clause. Why isn't the arbitrator the one responsible for determining whether these claims are within the scope of the arbitration agreement? Yes. There are two reasons. One, procedural, and the second is substantive. Procedurally, that issue was not articulated to the district court, and the district court didn't rule upon it. The delegation clause, as they refer to it, was cited in the introduction section of their motion to compel, along with other clauses of the arbitration agreement. They made no argument in their motion to compel that this was under Jackson, the Supreme Court case, or any other case, that this was a gateway issue, no argument whatsoever. They didn't raise that until their reply, and we know, of course, that you cannot raise a new issue in a reply, and it was actually the last thing that's hidden. You're talking about the reply brief here? No, the reply brief in the district court, and I think it's, I want to see, I can't remember the DE number, but it's the fifth argument of five arguments that they have in the reply, and they finally then cite to this court's unpublished opinion in Martinez and the U.S. Supreme Court in Jackson and say, this is a gateway issue. Well, they didn't raise that issue, and the district court didn't address it, no doubt, because it hadn't really been raised. So having not raised it below properly, the district court not having addressed it, then it's not properly. The district court didn't say this wasn't properly raised, correct? I don't even think the district court knew it had been raised, because he didn't address it at all. The district court ruled on the merits, right? Right. Went to the merits. Well, and almost to the point where he seemed to say, well, this is a pandemic, not a rape, so, of course, this is a different case, almost as if he went to the merits of the underlying intentional tort actions and just accepted their explanation that, hey, we're in a pandemic, you can't expect us not to act tortiously. So he made, I think, a merits decision that way, but he mostly made his determination on the arbitrability under the Bautista-Lindo construct and didn't really, again, Doe was only addressed in a footnote, and then the holding in Doe, I think, was misperceived by the district court at the urging of the cruise line. So I see that my time, I'll reserve the remainder unless there are other questions now. Yes, you'll have your full six minutes that you've reserved for rebuttal. Mr. Donao? Yes, good morning. Michael Donao on behalf of Celebrity Cruises. May it please the court. I'd like to begin with Judge Branch's observation regarding the delegation clause and to clarify a point that was made in Appellant's reply brief, which may be the source of some confusion. The reply brief claims that the argument was not raised, but it was raised. By Celebrity, in their reply, which is document entry number 35, at pages 8 through 9, the delegation clause was raised, and we asked the court that it should consider that delegation clause and compel arbitration on that basis. That was briefed there. They say it was only in the reply brief. It was never raised in the original part. Is that correct? The clause was referenced in the motion to compel. That's not what I'm talking about. The delegation clause. District Court, stop. Do nothing. We don't want you to rule on anything. Send it to the arbitrator. Did you say that when you went to the District Court in your first motion? Don't do anything. This goes to the arbitrator. Did you say that? We did not, and I'll explain why. I don't care why. I just want to know if it's in the first brief. We did reference and alert the court. Instead, you actually said, District Court, decide this on the merits right now. Here's what we want. It's covered by the arbitration. You construe the arbitration agreement. That's it. That's what you asked for, right? First brief, what did you ask the District Court? We filed a motion to compel and to dismiss the case, and we alerted the court to this delegation clause. And you said, because these claims, you want us to decide whether these claims are subject to arbitration. You asked the District Court to go to the merits of the arbitrability issue. I can't say it. I have trouble with that word, too. Okay. It's a tongue twister. Whatever that issue is, you asked the District Court to decide it. Well, we asked the District Court to decide it. Yes and no, and then you may explain. I want to say no, and I'll say why. What we did was, under 9 U.S.C. 206, celebrities' only remedy at that point was to alert the court and say, Your Honor, we have this arbitration provision. These are the four factors that need to be met under the convention for you to send it to arbitration. There's a written contract. No, that's not true. We have a lot of cases where you say to the District Court, Don't decide anything. This is all for the arbitrator to decide. Send it to arbitration. You can do that. People do that all the time. Well, what we did here was we alerted the court to the fact there was this arbitration provision, and we asked it to be sent to arbitration. We've had cases where we've filed that motion and it's been voluntarily withdrawn. Because on the merits of the arbitration, you wanted the District Court to construe the arbitration clause and say it fell within the arbitration clause. You asked them to decide the A issue, I must call it. Is that correct? You may have done something else, but you certainly did that. My understanding of what we did in the motion to compel was that we asked it to decide that there were these four factors under the New York Convention that were met and that the matter belonged in arbitration. Then when we, in response, there was a challenge. And what were those four factors? That was in the scope of the arbitration agreement. Sure, that there's an agreement in writing to arbitrate, which there was a provision. Two, that the agreement provides for arbitration in the territory of a convention signatory. Three, that the agreement arises out of a commercial legal relationship. And four, a party to the agreement is not an American citizen. Now, when there was a challenge made to the arbitration provision for the first time in our memorandum in opposition, that's when we said, Your Honor, this issue, this specific issue here as to whether there is the A issue is for the arbitrator to decide. And that was raised. The court, and there was a host of other arguments and defenses that were raised in the memorandum in opposition, which is at document number 27, which in an abundance of caution we raised, but we brought it to the court's attention. The court did not affirm on that basis. Excuse me, it did not order arbitration on that basis. It ordered it based on deciding the A issue. Correct. It went ahead and decided the A issue. And it never decided the delegation issue. It did not. Okay. Unfortunately, it did not. But that does not prevent this court, nonetheless, from considering it because the issue was preserved. And if anything, it's the right for the wrong reasons. That said, regardless of the delegation issue, even on the merits, what we really have here is a broad arbitration provision that covers anything that's related to or connected to the employment aboard the ship. How is it connected to employment when the employment's been terminated? By you. Undisputedly. You don't dispute you terminated the employment, right? March 30th forecast. That is not correct. All right. And you paid them no wages after March 30th. That is the allegation. That is what's alleged, correct, that no wages were paid. Yeah, right. They may have been paid wages because of the COVID-19 pandemic, I believe it was. For a couple of weeks. There was some stipends that were being made. I don't know if they received those or not. That was in the materials that was submitted. Let's go back on March 30th. You terminated the contract. The employment relationship was terminated. And all of their alleged tortious conduct occurred after termination of the contract. Is that correct? Or let's say that's what these counts are. They're saying after termination of the contract, you falsely imprisoned us on the ship. I don't know if they're going to be able to prove that. It seems like you can walk off a ship. I don't know whether you barred the doors or what you did. But that's another day. I believe that's not entirely correct, Your Honor, given the timeline. Because if I remember correctly, in their complaint, they're alleging that the ship was sailing, that the pandemic started in mid-February, mid-February 20th, and that they were sailing. They should have been repatriated. Let's do this. Some of the false imprisonment contract occurred after you got to San Diego. I would say I think the question is some of the false imprisonment allegedly occurred after they were terminated in March 20th. But there may have been some false imprisonment that occurred beforehand as well. While they're cruising around to get to where they're going. Correct, given the situation with the pandemic. But anyway, once they got in, was it Mexico? Were they terminated before Mexico, though? Actually, I have a timeline. I can tell you. This is an interesting issue. In any event, some of the false imprisonment was after you got to Mexico. I mean, after you got to San Diego, right? I guess it would be, from your questions, I'd say after the agreement was terminated. But my point is that the arbitration clause, which covers these claims, survives the termination. OK, tell me about that. How does that? Sure, because it's a broad clause that anticipates that if the employment agreement is terminated, the arbitration remedy has been canceled by the termination. And if these two claims, which they do, the false imprisonment and the intentional infliction of emotional distress, if they flow from the employment relationship, they're still covered by the— How do they flow from the employment relationship when it's terminated? I got my timeline. You got to San Diego on March 20th, and you terminated their contracts March 30th. So you're in port in San Diego, and it's terminated March 30th. Right. So the contracts were not terminated until you were in San Diego. You were under a no-sale order by the CDC at that point in time. To answer your question, they flow from the employment agreement under the allegations of their amended complaint, which is what controls— So suppose a crew member, they get to San Diego, and they rape them in San Diego. Does that flow from the employment? Under Doe, the rape would not, but— Okay, so why doesn't false imprisonment? Basically, one of your—they allege—again, I have no idea where they can prove any of this at all. What is the difference between raping somebody and you say you can't—I've terminated, you cannot get off the ship. You held them captive. They even say would not let us escape. How do you even articulate how that's different than Doe? I don't know whether Doe is right or not, but that's what I've got to follow. Right, because they're born out of the employment relationship, and what I mean by that is that, unlike the rape situation in Doe, this was not spelled out in their contract of employment. Celebrity had obligations to repatriate these individuals, and that is, in fact, what the complaint says. So they can couch these issues— That's in count one. Count two on false imprisonment. The other counts say nothing about it. They could couch these issues as tort, but that doesn't mean that, in fact, that the allegations of the complaint are not premised on the employment relationship. And if you look at the amended complaint, which is document entry number 19, repeatedly it is obvious from the allegations— Okay, you've answered my questions. Thank you so much. Okay. So I'd like to bring the Court's attention to the amended complaint, where it says, for example, in paragraph 59 of the amended complaint, it states that the crew member were entitled to the rights of repatriation under U.S. law, Maltese law, international law, and the collective bargaining agreement. The collective bargaining agreement was incorporated into their employment contract. So even the complaint acknowledges that these claims are born out of the contract, out of this breach of this contract. They may plead it in tort, but what we really have here is a breach of the employment contract. But none of that is in the intentional tort counts, right? Well, they incorporated— It just says they were held captive against their will. Right, but they incorporated the foregoing paragraphs into those claims, into the intentional infliction, and into the— I believe they put paragraphs 1 through 47. It was actually broader than that. I think that was a typo from the first complaint. But all those allegations about these breaches of the collective bargaining agreement and what rights and obligations they were owed under the contract, which they were not afforded, these repatriation rights, that was incorporated into those claims. You're saying when it incorporates paragraphs 1 through 47 that that's a typo? I believe so because if you— I think it carried over from the first complaint. But regardless, if you look at paragraphs 25, 28, 35, 36, 37, 42, 43, 44, 45, 46, all those reference repatriation and the fact that they were not repatriated. So what you're saying is if we had an amended complaint and they weren't seeking any of their rights under the contract, if they weren't seeking unpaid wages, if they weren't seeking repatriation, if they just said, this is right, you fired us as of March 30th, we have no contract with you, and we're suing you for the false imprisonment. Would you agree that the arbitration provision is not going to cover any of the claims that are arising after the date of termination? No. The arbitration clause survives the termination. Well, and I would agree with you that to the extent the claims allege conduct that occurred during the contract, that the arbitration clause survives. But once you terminate the contract, and this is back to Judge Hall's question, once the contract has been terminated, if there are no claims under the contract, because repatriation and wages are under the contract, if none of those existed, if it's simply, you falsely imprisoned me after you terminated me and that false imprisonment did not arise until you terminated me, how are you traveling under the contract or terms? Right, because although the contract terminates, there are still certain obligations which are owed to the seaman under the collective bargaining agreement and under the PEOA agreement. What are those obligations? Because I thought you said there were no obligations. Well, it would be the obligations to repatriate. Not under the contract. It says once you've terminated somebody for cause, you don't have to repatriate them. I believe it says that you have 24 hours to arrange from my reading of it initially. That was my understanding, and I believe under the PEOA, there's also several provisions there, and there's also a provision there. But it's not about termination for cause. There's also, and it escapes me now, there's another provision that when there is a, something that prevents sailing, and it kind of has to do with this same issue, there's also discussion there. I want to say it's Section 27 of the PEOA. Prevents sailing is still traveling under the contract. Here you have terminated the contract for cause, and so all of these rights that they're claiming, if they're claiming repatriation and lost wages, those would fall under the contract. But any claims arising out of torts occurring after the termination, I still am at a loss as to what duties are still owed under the collective bargaining agreement. I think it's the, I want to say it's the, I want to say it was the Martinez case, which I cited in my brief, deals with the termination, and it was... But there's termination and termination for cause. Is Martinez termination for cause? No, it's just contract is terminated. That's the wrinkle in this case. Okay. Termination like you've come to the end of your two-year contract or we extended you 90 days, and now the 90 days is this regular termination. There's all kinds of very complicated obligations and duties. Okay. And the CBA is incorporated, let's say, into this contract. We've got that. They've got all these allegations. But the fact is, it's now, whatever the CBA says is incorporated in the contract, but the contract is terminated. And I'm looking at their prayer for relief. They don't ask for wages or anything. They say for compensatory damages, costs, attorney's fees, punitive damages. You know, it's a classic, again, I don't know that they can convince a jury they can get off the ship. It was barred the door when you had no place else to live. Where are they going to live? I mean, I don't know, but I'm just trying to see if this type of drafting will get outside. On a motion to dismiss. That's all we're here on, right? And to compel arbitration. I see my time is up. I thank you for your time, and I respectfully ask that the court affirm on the basis that there is an arbitration provision that says that this is for the arbitrator to decide and two, on the scope of the arbitration clause. Thank you. Thank you. Mr. Parrish, you have six minutes. Hopefully I will not take them all. So we're here on the intentional tort claims post-termination, not anything before. The complaint, of course, had a number of other counts in it. Some of the language she cited was from the commonality paragraph, and, of course, it was addressing other counts as well. So, yes, there was some language about repatriation there. We're not seeking damages for not repatriating us within 24 hours. We're seeking compensable damages for false imprisonment for weeks and months that occurred post-termination. And just because it was raised here, I want to mention survivability. There is no survivability language whatsoever in the arbitration agreement. In Montero and in Martinez, there was. Here in Montero dealt with activities that occurred prior to termination, and it wasn't a termination for cause. It was a termination by operation of the contract because the person was injured and had to be off the ship for medical treatment for more than the length of the voyage. So there is no survivability language, as there was in Martinez and Montero, in this provision. It just doesn't exist. That wasn't raised below because— Let me ask you a question about your allegations and the intentional tort claims. You say, celebrity intentionally caused the plaintiffs to be held captive against their will, but then it says, with no wages or ability to leave the ship, which sounds like it's harking back to the contract. Well, so, and again, the point is you've terminated our contracts, and so therefore you're not paying us. You're not paying us under our contract. You've terminated our contract, so therefore we're not making wages, we can't get off the vessel, and we can't go make money somewhere else. So we are—that's part of, I guess, the damages. Now, whether that becomes—but the real issue is, you know, you're holding us there essentially as prisoners, and Judge Hall, believe me when I say I have high confidence that we will be able to establish that they could not just walk off this vessel. I have very high confidence on that. It's very relevant, right. I understand that, but just because you had expressed some concern about that. But the counts for the intentional torts are to recover whatever compensable damages are available there. But you just said it could include lost wages, right? Well, no, it wouldn't be lost wages. It would be possibly the inability to go earn wages because you're a prisoner. If you imprison me, I can't go get another job. That's the wages that are—the only wages that are referenced there. We're not seeking wages that were due under the contract. The contract has been terminated. And any claim for wrongful termination, all that has been cast aside, has been dropped, and we're only going on post-termination torts. So any reference to wages is, hey, we're here, we can't earn a wage anymore, and we can't get off the ship. So that's part of what—it would be like we can't go—it's causing us both mental and financial anguish that we can't get off this vessel and go earn a living somewhere else, and we can't go see our family, and we're stuck here. I mean, there was—talking about suicide in the prior case, some crew members committed suicide. There was hunger strikes. This was a horrible situation for these crew members. Again, I don't want to get too much into the facts because we're not here on the facts, but as much as they're going to rely on, you know, our hands were tied by the pandemic, we believe that we'll be able to establish that they were really more concerned about money than they were about their crew members, and that's the fight that I think we will need to have, again, speaking hopefully upon remand. If there are no further questions, I would ask the Court to reverse on those two post-termination intentional tort claims. Thank you very much. Court will be adjourned for the week. Thank you.